UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| NICKI L. MCQUEEN,           )<br>                               )<br>         Plaintiff,           )<br>                               )<br>     vs.                      )<br>                               )<br> CAROLYN W. COLVIN, Acting    )<br> Commissioner of Social Security, )<br>                               )<br>         Defendant.           )  | No. 1:15-cv-1190-TWP-DKL |

*Entry on Judicial Review*

Nicki L. McQueen appeals the denial of her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act (the "Act"). *See* 42 U.S.C. § 405(g). The parties have consented to the Magistrate Judge's exercise of jurisdiction. The decision should be remanded for further consideration.

*Background*

In April 2012, McQueen, then age 32, applied for disability insurance benefits and supplemental security income. She alleged disability since April 23, 2012, due to severe manic depression, anxiety, and chronic pain. [R. 252.] Her claims were denied initially and on reconsideration, and in December 2013 a hearing was held before an Administrative Law Judge ("ALJ"). McQueen and a vocational expert ("VE") testified at the hearing. Although McQueen suffers from both physical and mental impairments, this appeal focuses on her mental impairments.

McQueen testified that she was born in 1979 and was 34 years old. [R. 38.] She last worked in April 2012; she stopped because she was having panic attacks and anxiety attacks at work. [R. 39.] She was taking prescription medications, including Zoloft (an antidepressant), Ultram (a narcotic pain reliever), and Flexeril (a muscle relaxant). [R. 40.] Side effects of the medications are memory loss and tiredness. [*Id.*]

McQueen does laundry, dishes, and vacuums "a little bit." [R. 44.] These activities amount to at most 30 minutes a day. [R. 260.] She makes a meal once a week. [*Id.*] She watches T.V. about 4 hours a day. [R. 44.] She lives with her two children ages 12 and 13 and her cousin, who picks up the slack around the house. [*Id.*] She has trouble sleeping. [R. 48.] She drives once a week, going to see a doctor or to the grocery store. [R. 45.] She works on a computer "here and there" for about one hour total per week, submitting her daughter's homework assignments for "online schooling." [*Id.*] McQueen reads and talks on the phone about 30 minutes a day. [R. 46.] She sees her mother twice a month; she sees no other relatives or friends. [R. 47.] She has a brief conversation at the mailbox with "a nice neighbor" once a week. [*Id.*] McQueen attends her daughter's gymnastics once a month. [R. 49.] Being around a lot of people causes her anxiety. [R. 50.] She experiences good days and bad days, with about 4 bad days a week. On such days, she is in a high state of anxiety or depression or is "hurting really bad." [R. 52.] On those days, she does not do dishes, cook, or other chores; she stays in her pajamas and does not leave the house; her cousin does things for her. [*Id.*]

McQueen provided medical records in support of her applications for benefits. Included among them were records from her primary care physician Dr. Neal Gamilla;

treating psychologist William Roll, Ph.D.; treating therapist Carol Childress, M.S.W.; treating psychiatrist R.L. Bailey, M.D.; the agency's examining psychologist Jillian Yee, Psy.D., HSPP; and the agency's examining physician, Kurt Jacobs, D.O.

Beginning in April 2012, McQueen sought mental health treatment with Dr. Roll and Ms. Childress. They assessed her with major depressive disorder, posttraumatic stress disorder, and gave her a GAF rating of 35. [R. 382-91.]

In June 2012, Dr. Bailey evaluated McQueen's mental impairments. The psychiatrist had seen McQueen weekly between April and May of that year. [R. 393.] Dr. Bailey diagnosed major depressive disorder and PTSD and gave McQueen a GAF rating of 35. [*Id.*] The psychiatrist had observed McQueen crying frequently, being anxious, and irritable; and her thought processes were "rambling." [R. 394.] Dr. Bailey noted low motivation, crying spells, and panic attacks in support of the diagnosis [*id.*] and opined that McQueen's "high levels of anxiety and mood changes" would make her ability to attend to a simple work routine on a consistent basis "challenging." [R. 397.]

McQueen had two consultative examinations in August 2012. On August 10, Dr. Jacobs noted following his physical examination of McQueen that her understanding, memory, sustained concentration, and social interaction were abnormal. [R. 425-26.] He opined that she suffers from mental disease that "probably" would not improve with time. [R. 425.] Three days later, on August 13, psychologist Yee conducted a mental status examination and, on the basis of her findings, diagnosed McQueen with Bipolar disorder, severe without psychotic features; panic disorder with agoraphobia, posttraumatic stress disorder; and cocaine dependence in sustained full remission and

gave her a GAF rating of 49.  [R. 433.]  Yee concluded that McQueen "appears to have a great deal of trouble interacting socially," that "[w]orking in an environment with the public would be difficult," and that her level of persistence "may be negatively impacted by pessimism, fatigue, low motivation, generalized anxiety, panic attacks, PTSD symptoms, hypomanic symptoms, extreme irritability and physical issues."  [*Id.*]

At the end of the month, the agency's consultant Benetta E. Johnson, Ph.D., reviewed the records and assessed McQueen's mental residual functional capacity.  She concluded that McQueen had no more than a moderate limitation in any mental activity, *e.g.*, the ability to maintain attention and concentration for extended periods.  [R. 426-38.]

In July 2013, psychologist Roll and therapist Childress rated McQueen's mental function.  They noted a present mood disturbance accompanied by depressive syndrome characterized by symptoms including anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, psychomotor agitation or retardation, decreased energy, and difficulty concentrating or thinking.  [R. 679.]  They opined that McQueen suffered from manic syndrome characterized by pressured speech, flight of ideas, easy distractibility, and paranoid thinking, as well as bipolar disorder.  [R. 680.]  In addition, they noted that she experienced recurrent severe panic attacks on average at least once a week.  [*Id.*]  They opined that McQueen had marked restrictions in activities of daily living, social functioning, and concentration, persistence, or pace, and had had extreme episodes of deterioration or decompensation in work or work-like settings.  [R. 681.]

In December 2013, McQueen's primary care physician Dr. Gamilla, who had seen McQueen for almost three years [R. 334], gave an opinion regarding her mental health.

4

Like Dr. Roll and Ms. Childress, Dr. Gamilla concluded that McQueen's depression and anxiety resulted in functional limitations: marked restrictions in activities of daily living and social functioning; he also opined that she had marked episodes of deterioration or decompensation, but only mild deficiencies in concentration, persistence or pace. [R. 716.] Dr. Gamilla noted symptoms including psychomotor agitation or retardation, decreased energy, and recurrent severe panic attacks. [R. 714-15.]

Using the five steps for analyzing disability claims, *see* 20 C.F.R. §§ 404.1520(a)(4) and 416.902(a), the ALJ first found that McQueen had not engaged in substantial gainful activity since her alleged onset date. [R. 14.] The ALJ then determined that she had numerous severe impairments, including chronic pain, major depressive disorder, depression, post-traumatic stress disorder, anxiety, panic disorder with agoraphobia, personality disorder, and bipolar disorder. [R. 14-15.] None of the impairments or combination of impairments, the ALJ found, meets or medically equals the severity of a listed impairment. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. [R. 16.] The ALJ determined that McQueen had the residual functional capacity to perform a range of medium work with restrictions, including that she "is limited to unskilled tasks in an environment free of fast-paced production requirements;" she "is limited to occasional interaction with supervisors and co-workers, and no interaction with the public;" and she is "limited to work that allows her to be off-task for five percent of the workday, in addition to regularly scheduled breaks." [R. 19.]

The ALJ asked the VE to consider a hypothetical younger person with a high school equivalent education, McQueen's past relevant work experience, and the same

residual functional capacity, and asked if such an individual could perform any work. [R. 64-65.] The VE said that such an individual could perform jobs such as mail clerk (other than post office, office machine operator, and housekeeper/cleaner. [R. 66.] Based on this testimony, the ALJ found that McQueen was unable to perform any past relevant work but could perform these other jobs. [R. 22-23.] Therefore, the ALJ concluded that McQueen was not under a disability and denied her applications for benefits. [R. 24.] The Appeals Council denied review and this action followed.

*Discussion*

Judicial review of an ALJ's decision is limited to determining whether the findings are supported by substantial evidence and whether there has been any legal error. *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). "Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). The district court considers the record as a whole but cannot reweigh the evidence, make credibility determinations, or substitute its judgment for that of the ALJ. *See Stepp*, 795 F.3d at 718. An ALJ is not required to mention all evidence in the record but must build a "logical bridge" from the evidence to her conclusions. *Varga*, 794 F.3d at 813.

In challenging the ALJ's decision, McQueen argues that the ALJ erred in weighing the opinions of her treating and examining providers. In general, a treating physician's opinion about a medical condition is given more weight than the opinion of other, non-treating medical sources. *See* 20 C.F.R. § 404.1527. This is because a treating physician is more familiar with the claimant's conditions and circumstances. *Gudgel v. Barnhart*, 345

F.3d 467, 470 (7th Cir. 2003). If a treating physician's opinion on the nature and severity of a medical condition is well supported by medical findings and not inconsistent with other substantial record evidence, the regulations entitle it to controlling weight. *Id*; *see* 20 C.F.R. § 404.1527(c)(2). If a treating physician's opinion is not given controlling weight, then the ALJ must consider certain factors in deciding how much weight to give it. *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014); 20 C.F.R. § 404.1527(c)(2). An ALJ is not required to discuss each of these factors in her decision; however, when the factors are addressed, the Court is in a better position to evaluate whether the ALJ gave appropriate weight to the treating physician's opinion. *See Scrogham*, 765 F.3d at 697. An ALJ must give "good reasons" for rejecting a treating physician's opinion. *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014).

Although the ALJ noted that in August 2012 Dr. Yee gave McQueen a GAF score of 49, which is consistent with serious psychological symptoms, the ALJ found that "treatment records indicate that she was not receiving treatment from a mental health professional at that time" and that "[s]ubsequent treatment records note her improvement with medication and ongoing therapy." [R. 18.] The ALJ reasoned that McQueen's "high-level daily activities also show sustained mental capacity and are consistent with no more than moderate limitations in this area." [*Id.*]

GAF Scores "are 'useful for planning treatment' and are measures of both severity of symptoms *and* functional level." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (quoting Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (Text Revision, 4th ed.2000)). A GAF score "does not reflect the clinician's opinion of

7

functional capacity" and an ALJ is not required "to determine the extent of an individual's disability based entirely on h[er] GAF score." *Id.* (citation omitted).

However, the ALJ's reasoning is flawed. First, subsequent treatment records contain findings that McQueen had anxious and sad mood and affect, pale and tearful affect, pressured speech, poor memory, fair attention, hyperactive behavior, and distractibility (October 2 and 23, 2012; November 6, 2012; June 21, 2013). [*See, e.g.*, R. 598, 614, 617, 619.] Even assuming McQueen improved somewhat, whether she improved enough to perform the mental functions of work is another question. What's more, McQueen's GAF ratings actually *decreased*. Her GAF was rated seven times after her consultative examination with Dr. Yee, and six of her scores were 39 and one score was 40. [R. 599, 602, 605, 609, 615, 617 620.] While these scores alone would not require a remand, they were consistent and reasonably suggest that McQueen's symptoms and/or functional level had not improved subsequent to her examination, but had deteriorated despite her treatment. The ALJ should confront this evidence on remand.

Further, the ALJ fails to identify which of McQueen's daily activities were supposedly "high-level" and reflect sustained mental capacity. McQueen testified that she has good days and bad days, and that the latter occur days four days a week. It is known that a person with a mental illness "will have better days and worse days." *See, e.g.*, *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). On good days, McQueen can do dishes, vacuum a bit, watch T.V., drive to the store or an appointment, and spend some time on the computer submitting her daughter's homework assignments. (Recall that McQueen said that her time on the computer amounted to about one hour a week.) But

8

on bad days, she does not do the dishes, cook, or do other chores. Instead, she stays in her pajamas, she does not leave the house, and her cousin who lives with her picks up the slack. It is difficult to see how such minimal daily activities (even on good days) show a sustained mental capacity and allow for full-time work, 8 hours a day, 5 days a week, or an equivalent work schedule.

Moreover, the ALJ's reasons for discounting the opinions of treating psychologists Roll and Bailey and treating therapist Childress are also flawed. "[O]nly probative weight" was given "to the medical source statements of treating therapists." [R. 22 (citing Exhibits 3F (Bailey's report of psychiatric status) and 21F (Roll and Childress's questionnaire).] The ALJ explained:

> Although the opinions are based upon medical specialty and an ongoing treating relationship, the assessments are not entitled to special significance or controlling weight as the assessments appear to be primarily based upon the claimant's subjective reports (Exhibit 3F) and/or the degree of restriction is inconsistent with objective evidence and the claimant's daily activities (Exhibit 21F).

[R. 22 (referring first to Dr. Bailey's opinion and then that of Dr. Roll and Ms. Childress).] "But psychiatric assessments normally are based primarily on what the patient tells the psychiatrist, so that if the [ALJ] were correct, most psychiatric evidence would be totally excluded from social security disability proceedings—a position [the Seventh Circuit] has rejected…." *Price v. Colvin*, 794 F.3d 836, 839–40 (7th Cir. 2015); *Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015). Like the psychiatrist in *Price*, Dr. Bailey should have been able to recognize if McQueen were exaggerating. And the ALJ did not identify what objective evidence was inconsistent with the restrictions imposed, making it more difficult for this

9

reviewing Court to determine whether the opinion was weighed appropriately. In addition, the objective evidence (treatment records) seems to support the degree of restrictions, and McQueen's daily activities are far from substantial, as the ALJ seemed to believe.

And according to the ALJ, there was "no evidence of any history of mental decompensation in the workplace." [R. 22.] The ALJ must have overlooked the evidence in the records of both Dr. Yee and Dr. Gamilla that McQueen was fired from her job in 2012 because she "went off" on her boss. [R. 349, 432.] McQueen had also reported to these providers that she had frequent crying spells at work, which interfered with her productivity, and at times, she was reprimanded for them. [*Id.*]

The ALJ gave "little weight" to Dr. Gamilla's opinion on the grounds that it was "unsupported by objective evidence and addresses impairments outside the scope of his specialty." [R. 21-22.] This reasoning is flawed as well. *See Hummel v. Astrue*, No. 1:11-cv-1030-WTL-DKL, 2012 WL 3811852, at *7 (S.D. Ind. Sept. 4, 2012) (concluding that an ALJ may not reject treating and examining physicians' opinions solely because no objective medical evidence supports them); *Bullard v. Astrue*, No. 4:09-cv-19-WGH-RLY, 2010 WL 779454, at *15 (S.D. Ind. Feb. 26, 2010) (holding ALJ erred in viewing unfavorably treating physician's opinions about claimant's mental health solely on ground that physician was not a psychologist). Besides, objective medical evidence in the record, such as findings on mental examination, supports the mental functioning assessment.

In any event, Dr. Gamilla's assessment was consistent with the assessments of the mental health specialists (Drs. Yee, Bailey, and Roll as well as Ms. Childress), a point the

ALJ seemed to have overlooked. Generally, more weight is given to a specialist's opinion about medical issues related to his or her area of expertise. *See* 20 C.F.R. § 404.1527(c)(5). And the consistency of opinions is a factor that must be considered by an ALJ. *See id.* 404.1527(c)(4). The ALJ's decision fails to acknowledge the consistency among the opinions of all the treating providers Dr. Roll, Dr. Bailey, Dr. Gamilla, and Ms. Childress—all of whom found that McQueen's psychological impairments caused her to have functional limitations greater than those found by the ALJ. And the ALJ failed to acknowledge the agreement between the treating providers and the agency's consultant Dr. Yee, who as such is an expert in Social Security disability evaluation. *See Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) ("A consulting physician may bring both impartiality and expertise.") (citation omitted); 20 C.F.R. § 404.1527(e).

      The ALJ gave "considerable weight" to Dr. Johnson's RFC assessment, explaining that it was supported by the results of the mental status testing and McQueen's substantial daily activities. [R. 21.] But this reasoning is flawed. Unlike the opinions of the treating providers, Dr. Johnson never examined McQueen. Generally, more weight is given to the opinion of a source that has examined the claimant than to one that has not. 20 C.F.R. § 404.1527(c)(1). More troubling, however, Dr. Johnson did not have the benefit of McQueen's more recent mental health records, including the mental exam results and opinions from Drs. Roll, Bailey, and Ms. Childress. The Commissioner responds that an agency consultant's opinion will almost always be dated, that is the nature of the agency proceedings. In this case, however, the consistency among the later opinions given by Dr. Gamilla, Dr. Roll, and Ms. Childress suggests that Dr. Johnson was

11

reviewing a very different mental health picture than they, and their opinions and records as well as the Centerstone mental health records may have made a difference in his view of McQueen's limitations. Finally, as noted, according to her testimony, McQueen's daily activities were far from "substantial."

The Court is not concluding that the record compels the conclusion that McQueen is disabled under the Social Security Act; however, the ALJ's reasoning behind the weight given to the medical opinions is flawed. On remand the ALJ should reconsider the medical opinions and provide good reasons for the weight given to each of them.

*Conclusion*

For the foregoing reasons, the Commissioner's decision denying benefits should be **REMANDED** to the Social Security Administration for further consideration consistent with this Entry.

DATED: August 8, 2016

*Denise K. LaRue*
Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Electronic distribution to counsel of record